# In the United States Court of Federal Claims

No. 16-1000C

(Filed Under Seal: November 22, 2016)

(Reissued:  December 2, 2016)

| | |
|---|---|
| CSC GOVERNMENT SOLUTIONS LLC, | Post-award bid protest of an IT contract; cost-realism analysis; application of FAR § 52.222-46 to realism of proposed salaries with regard to program continuity, retention of professional employees, and "uninterrupted high-quality work;" consistency of the agency's cost-price and technical evaluations; past performance evaluation; discussions |
| Plaintiff, | |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| HP ENTERPRISE SERVICES LLC, | |
| Defendant-Intervenor. | |

_____

Kevin P. Mullen and J. Alex Ward, Morrison & Foerster LLP, Washington, D.C. for plaintiff.  With them on the briefs and at the hearing was Sandeep N. Nandivada, Morrison & Foerster LLP, Washington, D.C.  Also with them on the briefs were Catherine L. Chapple and Richard J. Vacura, Morrison & Foerster LLP, Washington, D.C.

Peter A. Gwynne, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant.  With him on the briefs and at the hearing were Michael G. McCormack, Senior Trial Attorney, and Matthew J. Ruane, Attorney Advisor, United States Air Force.  Also with him on the briefs were Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Civil Division, Robert E. Kirschman, Jr., Director, and Douglas K. Mickle, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C.

Kevin J. Maynard, Wiley Rein LLP, Washington, D.C. for defendant-intervenor.  With him on the briefs and at the hearing were Jon W. Burd, George E. Petel, Gary S. Ward, and Tara L. Ward, Wiley Rein LLP, Washington, D.C.  Also with him on the briefs was Rand L. Allen, Wiley Rein LLP, Washington, D.C.

**OPINION AND ORDER**[1]

LETTOW, Judge.

This post-award bid protest arises from a solicitation by the United States Department of the Air Force, United States Strategic Command ("USSTRATCOM" or "government") for the Information Technology Capabilities Contract II ("ITCC II"). The ITCC II contract provides for information technology ("IT") capabilities and services at USSTRATCOM's current headquarters at the Curtis E. LeMay Building in Omaha, Nebraska, as well as for transitioning IT services at some time after the second year of the contract to USSTRATCOM's future headquarters at the Command and Control Facility ("C2F"), also located in Omaha. Following several rounds of proposals and evaluations, the government awarded the ITCC II contract to HP Enterprise Services, LLC ("HPES") on April 18, 2016. CSC Government Solutions LLC ("CSC"), the incumbent contractor and also an offeror on the ITCC II contract, initially protested this award at the Government Accountability Office ("GAO"), challenging the government's evaluation of the offerors' proposals and past performance and alleging that the government conducted misleading and coercive discussions with CSC. On August 10, 2016, GAO denied CSC's protest on all grounds. CSC subsequently filed a bid protest in this court on August 12, 2016.

CSC now seeks an injunction against the award to HPES, reasserting its argument that the government engaged in misleading, unequal, and coercive discussions, and further arguing that USSTRATCOM failed to properly evaluate the proposals of HPES and another offeror, [***], particularly in its cost realism analyses and evaluations of the offerors' phase-in plans for staffing and retention. Pending before the court are the parties' cross-motions for judgment on the administrative record. A hearing was held on October 26, 2016.

For the reasons stated, the court has concluded that the plaintiff's motion should be denied and the government's and defendant-intervenor's motions should be granted.

**FACTS**[2]

*A. USSTRATCOM: Background and IT Needs*

---

[1]Because this opinion and order might have contained confidential or proprietary information within the meaning of Rule 26(c)(1)(G) of the Rules of the United States Court of Federal Claims ("RCFC") and the protective order entered in this case, it was initially filed under seal. The parties were requested to review this decision and provide proposed redactions of any confidential or proprietary information. The resulting redactions are shown by brackets enclosing asterisks, *e.g.*, "[***]."

[2]The recitations that follow constitute findings of fact by the court drawn from the administrative record of the procurement filed pursuant to RCFC 52.1(a). *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1356 (Fed. Cir. 2005) (specifying that bid protest proceedings "provide for trial on a paper record, allowing fact-finding by the trial court").

USSTRATCOM is "one of nine unified combatant commands in the Department of Defense." Def.'s Resp. in Opp'n to Pl.'s Mot. for Judgment on the Administrative Record and Def.'s Cross-Mot. for Judgment on the Administrative Record ("Def.'s Cross-Mot.") at 4, ECF No. 48. It "conduct[s] global operations" for and with the Department of Defense and government agencies to "deter and detect strategic attacks against the U.S. and its allies, and be prepared to defend the nation as directed." AR 4-689.[3]  The headquarters of USSTRATCOM is located at the Curtis E. LeMay Building in Omaha, Nebraska. Am. Compl. ¶ 6. A new headquarters, C2F, is under construction and is expected to be completed during the performance of the ITCC II contract. *See* Am. Compl. ¶ 11; AR 5a-829.

To carry out its mission, USSTRATCOM requires "numerous information technology (IT) systems of various classification levels." AR 4-689. Its specific IT requirements include: "command and control, robust nuclear and conventional planning and planning support tools, integrated shared awareness portals, real-time web-enabled reporting vehicles, and several collaborative voice and video capabilities spanning all levels of classification." *Id.* USSTRATCOM's IT contractor thus provides crucial support services to the agency, including "[o]perations [and] [m]aintenance, systems engineering, and program management." *Id.* CSC is the incumbent IT contractor for USSTRATCOM under the first ITCC contract ("ITCC I"). Am. Compl. ¶ 6. Its specific responsibilities include: "managing desktops, servers, networks, and related functional services; reducing the cost to USSTRATCOM of delivering desktop, server, and network services; and facilitating IT management through the evolution of a more common IT environment [to] enhance[e] system and product interoperability." Am. Compl. ¶ 7.

### B. The Solicitation of the ITCC II Contract

After consulting with industry professionals for over a year, *see* AR Tab 3; Def.'s Cross-Mot. at 5, USSTRATCOM issued its Source Selection Plan for the ITCC II contract on June 30, 2014 and issued its Request for Proposals ("RFP") (solicitation number FA4600-14-R-0017) on October 1, 2014. AR Tabs 4-5.[4]  The solicitation contemplated the award of a single contract with multiple contract line item ("CLIN") types, including firm-fixed-price, cost-plus-incentive-fee, cost-plus-fixed-fee, and no-fee cost reimbursable. AR 5a-802. The contract covers a ten-year period, with a one-year base period and nine additional option years. AR 5a-950. The base year includes a three-month phase-in period and a nine-month full-performance period. *Id.*

The ITCC II contract at issue here is a continuation of the services provided by CSC under the ITCC I contract. Def.'s Cross-Mot. at 4. The specific objectives of the contract are to:

---

[3]Citations to the administrative record refer to the record as filed on August 26, 2016 and corrected on August 29, 2016 and October 3, 2016. The record is paginated sequentially and is also divided into tabs. In citing to the administrative record, the court will first designate the tab, followed by the page number, *e.g.*, AR 4-689 refers to page 689, which is located in tab 4 of the record.

[4]The solicitation was amended eight times between October 17, 2014 and June 12, 2015 for reasons unrelated to the instant protest. *See* AR Tab 5e; *see also* AR 1-6 to -8.

    1) provide high-quality IT services to USSTRATCOM.
    2) provide IT capabilities that meet mission standards where appropriate, and industry
    standards elsewhere.
    3) provide the IT capabilities necessary for customers to perform their operational
    mission.
    4) reduce the cost to USSTRATCOM of delivering services.
    5) permit the contractor maximum flexibility in implementing IT to satisfy cost, schedule,
    and performance parameters.
    6) maintain high customer satisfaction.
    7) facilitate IT management through the evolution of a more common IT environment,
    thereby enhancing system and product interoperability.
    8) [m]aintain required IA standards.

AR 5a-804.  The contractor is thus expected to continue the same types of support services provided under the ITCC I contract, specifically "[p]rogram [m]anagement," "IT [o]perations and [m]aintenance," "[e]ngineering," and "[a]pplications [s]upport."  AR 5a-805.  The contract also contemplates undertaking and completing USSTRATCOM's transition to its new headquarters during the life of the contract.  *See* AR 5a-829.  The contractor is responsible for maintaining IT services in the old facility during the transition, and continuing these services in the new building once the transition is complete.  AR 5a-804, -29.

    The evaluation criteria in Section M of the RFP stated that the government would conduct a "best value" analysis and award the contract based on an assessment of three factors: "[t]echnical [a]pproach/[t]echnical [r]isk," "[p]ast [p]erformance," and "[c]ost/[p]rice."  AR 5a-971 to -72.  Past performance and technical risk were deemed to be of equal importance, and the cost-price factor was more important than the past performance and technical-risk factors combined.  *See* AR 5a-971.  Therefore, all offerors "found to have presented an [a]cceptable technical approach without [h]igh [r]isk" would be considered equally, and the contract would be awarded to the offeror with the lowest price.  *See id.*; Am. Compl. ¶¶ 35-36.  USSTRATCOM also reserved the right to select the second-lowest-priced offer (within 5% of the lowest priced offer) if the lowest priced offer did not present the "best value" and the second lowest offer "present[ed] [s]ubstantial [c]onfidence and [l]ow [t]echnical [r]isk in all sub-factors."  AR 5a-971 to -72.  Additionally, the government retained discretion to select an offer which was priced more than 5% above the lowest-priced offer if the higher-priced offer "present[ed] a remarkably better value proposal in terms of its past performance record and/or plan for dealing with, mitigating or eliminating program risk."  AR 5a-972.

    In the RFP, the government indicated that it would potentially award the contract without discussions with the offerors.  AR 5a-971.  If discussions were deemed necessary, the government would only hold them with "those offerors determined to be in the competitive range."  *Id*.  The government retained discretion over whether an offeror was in the competitive range, and could eliminate an offeror from consideration during the course of discussions even if it was initially determined to be in the competitive range.  *Id*.  Discussions would "include issuance of evaluation notices," and each offeror remaining in consideration at the conclusion of discussions would have the "opportunity to submit a Final Proposal Revision (FPR)."  *Id*.

*1. The technical-approach/technical-risk evaluation factor.*

The RFP outlined five sub-factors within the technical-approach/technical-risk evaluation factor: (1) Technical, (2) Management Approach, (3) IT Systems Optional Tasks, (4) Engineering, and (5) Small Business Participation Plan.  AR 5a-972.  The Technical sub-factor involved an assessment of the offerors' "capability to perform IT Operations and Maintenance in a large multi-classified operational environment," specifically in the areas of: (1) "service center," (2) "end user provisioning," (3) "network services," (4) "servers," and (5) "enterprise database services."  AR 5a-957.  The Management Approach sub-factor involved the evaluation of three aspects of the offerors' program management approach: (1) the "phase-in" plan, (2) "staffing, security clearances, certifications and skillsets," and (3) day-to-day program management.  AR 5a-957 to -58.  The IT Systems Optional Tasks sub-factor primarily would assess the offerors' plans for transitioning USSTRATCOM's IT capabilities to the new C2F headquarters.  AR 5a-958 to -59.  This sub-factor also involved the evaluation of the operation and maintenance of USSTRATCOM's command and control phone-switching system, as well as the potential transition of unclassified LAN services, "[u]nclassified and/or [s]ecret LAN SharePoint hosting services," and classified e-mail services to a provider other than the ITCC II contractor.  AR 5a-959.  The Engineering sub-factor would assess the "internal processes for engineering requirements and project management, technical solution development, testing and implementation/integration."  *Id.*  Finally, the Small Business Participation Plan sub-factor would evaluate "the offeror's identification of and commitment to small business in contract performance on the ITCC II program" in accord with the government's goals for small business participation in subcontracts.  AR 5a-959 to -60.

Each sub-factor would receive a rating for both technical approach and technical risk.  AR 5a-972.  The technical-approach rating would "reflect[] the degree to which the proposed approach meets or does not meet the minimum requirement" for the sub-factor.  *Id.*  Technical approach would be rated as either "Acceptable" or "Unacceptable," and any proposal that received an "Unacceptable" rating for one or more sub-factors would receive an overall "Unacceptable" rating for the technical-approach evaluation factor.  *Id.*  The technical-risk rating would assess the weaknesses of each offeror's proposal for each sub-factor, considering the "potential for disruption of schedule, increased costs, degradation of performance, the need for increased [g]overnment oversight, or the likelihood of unsuccessful contract performance."  AR 5a-973.  Each sub-factor would receive a technical-risk rating of Low (the most favorable rating), Moderate, or High.  *Id.*  Any proposal with a technical-risk rating of High for any sub-factor would be deemed ineligible to be awarded the ITCC II contract.  *Id.*

*2. The past performance evaluation factor.*

The past performance evaluation factor would assess "related contracts from each offeror" to make an "overall assessment of the [g]overnment's confidence that the offeror will successfully perform this contract."  AR 5a-974.  Each offeror had to submit at least three performance references with its proposal, but the government would "not evaluate more than six offeror provided references."  *Id.*  The government also reserved the right to obtain and assess offeror past performance data from other sources, such as the Past Performance Information

Retrieval System ("PPIRS"), other government databases, interviews with former program managers and contracting officers, and commercial sources. *Id*.

In evaluating this factor, the government would first determine whether each contract submitted as a past performance reference met recency requirements, specifically that it was performed on or after June 1, 2011 and that the performance was at least one year in length as of the submission of the reference to USSTRATCOM. AR 5a-974. The government would next assess the relevancy of each reference "as it relates to the scope, magnitude, and complexity of efforts described in the ITCC II solicitation." *Id*. The relevancy of each reference would be assessed under the following four sub-factors, which mirror the technical-approach/technical-risk sub-factors: (1) Technical, (2) Management Approach, (3) Engineering, and (4) Small Business Participation. AR 5a-974 to -75. Each sub-factor, as well as the reference as a whole, would receive one of the following relevancy ratings: Very Relevant, Relevant, Somewhat Relevant, or Not Relevant. AR 5a-976. Finally, each sub-factor and the reference as a whole would receive a qualitative performance rating of Exceptional, Very Good, Satisfactory, Marginal, Unsatisfactory, or Not Applicable. AR 5a-976 to -77. Upon integrating the analyses for recency, relevancy, and performance, the government would assign each offeror one of five confidence assessments for the past performance factor: Substantial Confidence, Satisfactory Confidence, Unknown Confidence (Neutral), Limited Confidence, or No Confidence. AR 5a-977.

*3. The cost-price evaluation factor.*

The RFP stated that the cost-price evaluation factor would be "assessed for fairness and reasonableness." AR 5a-978. The reasonableness assessment would determine whether the offeror's price was "a price that a prudent and competent buyer would be willing to pay, given data on competition, supply and demand, and general economic conditions." *Id*. The price evaluation would also include an assessment of the offerors' plans for compensating professional employees in accord with 48 C.F.R. [Federal Acquisition Regulation ("FAR")] § 52.222-46. AR 5a-978.

For CLIN X101 (Engineering), the CLIN primarily at issue in this case and the only cost-reimbursable CLIN in the ITCC II contract, the government would evaluate the proposals for both cost realism and cost reasonableness.[5] AR 5a-963, -78. Cost realism would be assessed via three factors: (1) that the costs "are realistic for the work to be performed," (2) that such costs "reflect a clear understanding of the requirements," and (3) that the costs "are consistent with the various elements of the offeror's technical proposal." AR 5a-978. Upon conducting this analysis, the government reserved the right to make adjustments to the offerors' proposed costs before and after they submitted their final proposals. *Id*.

---

[5]CLIN X101 makes up about 7% of the projected costs of the ITCC II contract. Hr'g Tr. at 69:13-14 (Oct. 26, 2016) (The date will not be repeated in further citations to the transcript of the hearing.).

Finally, the RFP required offerors to submit a Total Evaluated Price ("TEP") for all CLINs that included the base period and all option years. AR 5a-978. The TEP was evaluated for fairness and reasonableness. *Id.*

### C. USSTRATCOM's Evaluation of Proposals and Award Decision

USSTRATCOM received proposals from five offerors: CSC, HPES, [***],[***], and [***]. AR 25-41668. [***] was eliminated from the competitive range prior to discussions. *See* AR 25-41670; 42-45627.

After [***] was eliminated from consideration, discussions opened with the four remaining offerors on June 12, 2015. AR 27-42016. USSTRATCOM conducted three rounds of discussions with CSC, as well as a third round addendum. Am. Compl. ¶ 41. In the first round, the government issued an evaluation notice ("EN") to CSC stating that its "[p]roposed labor mix for Engineering, CLIN X101 ha[d] been evaluated as unrealistically low" because CSC had estimated that the labor for this CLIN could be reduced from 121,000 historical hours to [***] hours, and that CSC could reduce the [***] hour figure to [***] hours through various efficiencies. AR 10a-10233 to -34.[6] The EN requested that CSC provide a detailed explanation of these efficiencies that would justify the "substantial difference" between the proposal and the historical engineering labor mix. AR 10a-10233. During the second round of discussions, CSC proposed various efficiencies to show why [***] hours was a realistic labor estimate for CLIN X101, including [***]. AR 10b-16117 to -18. USSTRATCOM rejected these proposals and left the EN open, stating that CSC did not "demonstrate any unique and innovative approaches, [did not] provide an adequate explanation regarding the unrealistically low staffing, and fail[ed] to explain how the reasons provided w[ould] result in a manning level of [***] hours." AR 10b-16119. In the third round of discussions, CSC adjusted its labor mix totals, starting with about [***] hours for the base year, dropping to about [***] hours in the first option year, and ultimately proposing [***] to [***] hours for each of the following option years. AR 10c-21326 to -29. CSC justified these reductions based on five categories of proposed efficiencies: [***]. AR 10c-21326. USSTRATCOM largely rejected these proposed efficiencies as well. *See* AR 10c-21329 to -30.

HPES also engaged in discussions with USSTRATCOM regarding its labor mix for CLIN X101. Similar to its first EN to CSC, USSTRATCOM issued an EN to HPES stating that its proposed labor mix for CLIN X101 was "unrealistically low" because it had proposed staffing levels at [***]% of historical hours. AR 19a-38350 to -51. HPES explained in its response that the other [***]% of hours were accounted for under other CLINs in the proposal. AR 19a-38349. As with CSC, USSTRATCOM rejected HPES's justification and left the EN open. AR 19a-38350. In the second round of discussions, HPES revised its CLIN X101 estimates to reflect [***]% of historical hours ([***] hours, or [***] FTEs) for the base year, with staffing reduced in the option years to [***] FTEs for years 2 through 4 and to [***] FTEs for years 5 through 10. AR 19b-39248 to -49. HPES explained that these reductions in hours would be accomplished by clearing out a backlog of engineering projects during the first year of the contract, moving to a

---

[6]USSTRATCOM considered that a full-time equivalent ("FTE") employee worked approximately 1,900 hours per year. *See* AR 10a-10234.

standardized environment in the new C2F facility, and implementing various team-level efficiencies. *See id.* USSTRATCOM accepted this proposal and closed the EN without further discussion. AR 19b-39249.

[***] engaged in discussions regarding CLIN X101 as well. [***] also received an initial EN stating that its proposed labor mix for CLIN X101 was "unrealistically low." AR 89a-50193. [***] responded by raising its estimated labor mix from [***] FTEs to [***] FTEs. AR 89a-50194. USSTRATCOM rejected this proposal and left the EN open because [***] made an "incorrect assumption" regarding the allocation of engineering hours across multiple CLINs. *Id.* In the second round of discussions, [***] further revised its proposal to add about [***] FTEs per option year, providing [***] FTEs ([***] hours) in the base year and option years 1 through 3, [***] FTEs ([***] hours) in option years 4 and 5, [***] FTEs ([***] hours) in option year 6, and [***] FTEs ([***] hours) in option years 7 through 10. AR 89b-51341. USSTRATCOM accepted this proposal as "realistic" and "acceptable" and closed the EN without further discussion. AR 89b-51342 to -43.

Following these discussions, the government evaluated the proposals as follows:

| | | CSC | HPES | [***] | [***] | [***] |
|---|---|---|---|---|---|---|
| SF – 1 Technical | Technical | A | A | A | A | |
| | Risk | L | L | L | L | |
| SF – 2 Management Approach | Technical | A | A | A | A | |
| | Risk | L | L | L | L | |
| SF – 3 IT Optional Tasks | Technical | A | A | A | A | |
| | Risk | L | L | L | L | |
| SF – 4 Engineering | Technical | A | A | A | A | |
| | Risk | L | L | L | L | |
| SF – 5 Small Business | Technical | A | A | A | A | |
| | Risk | L | L | L | L | |
| Factor 1 – Overall Technical | | A | A | A | A | |
| Factor 2 – Past Performance | | Substantial Confidence | Substantial Confidence | Substantial Confidence | Substantial Confidence | |
| Factor 3 – Price/Cost | | [***] | [***] | [***] | [***] | |
| Probable Cost | | [***] | [***] | [***] | [***] | |
| Total # of Open ENs | | 2 | 0 | 0 | 0 | |

AR 26-41728. Each offeror received a rating of Acceptable for each technical-approach sub-factor, a rating of Low for each technical-risk sub-factor, an overall technical rating of Acceptable, and a past performance rating of Substantial Confidence. *Id.* As a result of the government's cost-realism analysis, CSC received a most probable cost ("MPC") adjustment of approximately $[***] million to its cost-price figure because it failed to fully address two outstanding ENs. *See* AR 26-41795 to -96; AR 11-32041. Even with the MPC adjustment, CSC was the lowest-priced offeror following the discussions. AR 26-41728.

The government requested Final Proposal Revisions ("FPRs") on December 8, 2015. AR 27-42016; *see also* AR Tabs 11, 20, 40, 41. The government's Final Proposal Revision request

letter to CSC stated that the significant difference between CSC's proposed costs for CLIN X101 and the most probable cost as assessed by USSTRATCOM raised concerns about CSC's ability to perform the contract as proposed, pursuant to FAR § 9.104-1.  AR 11-32043.  As a result, the letter stated that:

> [s]hould [CSC's] FPR require a probable cost adjustment and include a significant discrepancy between the proposed costs and the probable cost, this may preclude the Contracting Officer from making an affirmative determination of responsibility.  The absence of an affirmative determination of responsibility would render [CSC's] proposal ineligible for award.

*Id*.  The letters to HPES, [***], and [***] contained no such warning.  *See* AR Tabs 20, 40, 41.  The offerors submitted their Final Proposal Revisions on December 22, 2015 for final review by the Source Selection Evaluation Board ("SSEB").  AR 27-42016; *see also* AR Tabs 12, 21, 92, and 94.

USSTRATCOM gave the following ratings to the remaining offerors based on their Final Proposal Revisions:

| | | CSC | HPES | [***] | [***] | [***] |
|---|---|---|---|---|---|---|
| SF – 1 Technical | Technical | A | A | A | A | |
| | Risk | L | L | L | L | |
| SF – 2 Management Approach | Technical | A | A | A | A | |
| | Risk | L | L | L | L | |
| SF – 3 IT Optional Tasks | Technical | A | A | A | A | |
| | Risk | L | L | L | L | |
| SF – 4 Engineering | Technical | A | A | A | A | |
| | Risk | L | L | L | L | |
| SF – 5 Small Business | Technical | A | A | A | A | |
| | Risk | L | L | L | L | |
| Factor 1 – Overall Technical | | A | A | A | A | |
| Factor 2 – Past Performance | | Substantial Confidence | Substantial Confidence | Substantial Confidence | Substantial Confidence | |
| Factor 3 – Price/Cost – FPR | | [***] | $443.0M | [***] | [***] | |
| Probable Cost | | [***] | $443.0M | [***] | [***] | |
| Price change from Pre-FPR | | [***] | [***] | [***] | [***] | |

AR 28-42242.  As in the pre-FPR analysis, the offerors all received the same Acceptable technical rating and Substantial Confidence past performance rating.  *Id*.  CSC "agreed with the [g]overnment's assessment and most probable cost adjustment" from the pre-FPR evaluation,

and increased its proposed costs by $[***] million. AR 28-42120, -242.[7]  USSTRATCOM deemed this price to be "fair and reasonable" in its cost-realism analysis of the CSC FPR. AR 27-42024.  The FPR cost/price figures for both HPES and[***] were lower than their pre-FPR figures.  AR 28-42242.  HPES's price was deemed "fair and reasonable," while a $[***] probable cost adjustment upward for CLIN X101 was applied to [***]'s FPR as a result of the cost-realism analysis.  AR 27-42024 to -25.

The SSEB and Contracting Officer briefed the Source Selection Authority ("SSA") on their analyses of the offerors' Final Proposal Revisions on April 13, 2016.  AR 30-42979; *see also* AR Tabs 27-29.  The SSA determined that HPES's proposal represented the best value as defined in the RFP.  AR 30-42974.  USSTRATCOM awarded the ITCC II contract to HPES on that basis.  AR 30-42979.

### D. CSC's GAO Protect

After being notified by USSTRATCOM that HPES was being awarded the ITCC II contract, *see* AR Tab 31, CSC timely filed a protest of the award decision at GAO on May 2, 2016.  AR Tab 2.  On August 10, 2016, GAO denied CSC's protest.  AR 54-45924.  In its decision, GAO determined that USSTRATCOM's discussions with CSC were not misleading, unequal, or coercive, and that USSTRATCOM's evaluation of CSC's proposal was reasonable. AR 54-45928 to -35.  CSC was found not to have been misled into raising its proposed costs through its discussions with USSTRATCOM because the record showed that "the price evaluators had reasonable concerns regarding the staffing, hours, and cost proposed in CLIN X101."  AR 54-45933.  GAO determined that CSC's decision to adjust its proposed staffing levels and costs for CLIN X101 "reflected the exercise of the firm's own business judgment and not improper conduct by the agency."  AR 54-45933 to -34.  Furthermore, GAO also concluded that the discussions were not unequal among the offerors because they were properly tailored to each offeror's specific proposed approach.  AR 54-45935.

### E. CSC's Protest in this Court

On August 12, 2016, two days after GAO issued its decision, CSC filed its protest in this court.  *See* Compl.  In its complaint, CSC asserted five counts regarding the ITCC II procurement: (1) "the agency engaged in misleading, unequal, and coercive discussions," (2) "the agency's cost[-]realism analysis was inadequate," (3) "the agency's evaluation of HPES's transition and staffing approach was unreasonable," (4) "the agency's past performance evaluation ignored recent and relevant negative past performance information regarding HPES's ability to perform the ITCC II contract," and (5) "the best value decision was arbitrary and capricious."  Compl. ¶¶ 84-124.  Contemporaneously with its complaint, CSC submitted an application for a temporary restraining order and a motion for preliminary injunction.  Pl.'s Mot. for TRO and Prelim. Inj., ECF No. 5.  The court granted HPES's motion to intervene on August 15, 2016.  Order of Aug. 15, 2016, ECF No. 14.  During a hearing on August 16, 2016, "the

---

[7]CSC's final proposed cost was still $[***] million less than the most probable cost calculated by USSTRATCOM in its pre-FPR evaluation of CSC's proposal.  *Compare* AR 26-41728, *with* AR 28-42242.

parties represented that the government has agreed to voluntarily stay performance on the contract at issue until at least November 23, 2016." Order of Aug. 16, 2016, ECF No. 30.  The court therefore denied the application for a temporary restraining order as moot and consolidated the motion for preliminary injunction with the proceedings on the merits.  *Id.*

CSC filed an amended complaint on August 23, 2016 to remove its request for immediate injunctive relief and to add a new count alleging that USSTRATCOM's analysis of the offerors' proposals was deficient under FAR § 52.222-46.  *See* Mot. for Leave to File an Am. Compl., ECF No. 36.  Pursuant to the court's scheduling order, the government filed the administrative record on August 26, 2016, ECF No. 40.[8]  The parties' cross-motions for judgment on the administrative record have been submitted and fully briefed and were addressed at a hearing on October 26, 2016.

## JURISDICTION

Pursuant to the Tucker Act, this court has jurisdiction to "render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1), added by the Administrative Dispute Resolution Act, Pub. L. No. 104-320, § 12, 110 Stat. 3870, 3874 (Oct. 19, 1996); *see also Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012).  To be an "interested party" under the Tucker Act, the protestor must show that "(1) it was an actual or prospective bidder or offeror, and (2) it had a direct economic interest in the procurement or proposed procurement." *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1344 (Fed. Cir. 2008).  To prove direct economic interest, the offeror must show that it had a "substantial chance" of receiving the contract but for the government's alleged errors in the procurement process, *i.e.*, that it was prejudiced by such errors.  *Information Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003).

There is no dispute that CSC was an actual offeror for the ITCC II contract.  Furthermore, although CSC was not next in line for the contract behind HPES, it was still within the competitive range of a winning bid.  *See Science and Mgmt. Res., Inc. v. United States*, 117 Fed Cl. 54, 62 (2014) ("[A] bidder need not be next in line for the consideration of an award in order to possess standing; the substantial chance requirement is met where, but for the government's alleged error, the protestor would have been within the zone of active consideration.") (internal quotation marks and citations omitted).  HPES, [***], and CSC all had the same ratings for technical approach/technical risk and past performance, and CSC's final cost-price proposal was $[***] million greater than HPES's proposal and $[***] million greater than [***]'s proposal, which translates to [***]% and [***]% differences in price, respectively.  *See* AR 30-42977.  Because CSC's bid was quite close to the winning and second-place bids, it was within the competitive range.  CSC has therefore demonstrated jurisdictional prejudice and has standing to bring this suit.  *Compare Information Tech. & Applications*, 316 F.3d at 1319 (discussing

---

[8]The government filed corrected versions of the administrative record on August 29, 2016, ECF No. 41, and October 3, 2016, ECF No. 51.

jurisdictional prejudice), *with Bannum*, 404 F.3d at 1356-57 (addressing merits prejudice pursuant to the standards of 5 U.S.C. § 706, which sets out a "rule of prejudicial error"). *See Digitalis Educ. Solutions Inc. v. United States*, 97 Fed. Cl. 89, 93 (2011) ("A protestor must demonstrate prejudice twice: first to establish standing and then again to prevail upon the merits.") (citations omitted), *aff'd*, 664 F.3d 1380 (Fed. Cir. 2012); *National Air Cargo Grp., Inc. v. United States*, 127 Fed. Cl. 707, 716 (2016) (same).

## STANDARDS FOR DECISION

The Administrative Procedure Act ("APA"), specifically 5 U.S.C. § 706, governs the court's review of an agency's contract award. *See* 28 U.S.C. § 1491(b)(4) ("In any action under this subsection, the courts shall review the agency's decision pursuant to the standards set forth in section 706 of title 5."). A court may set aside an agency decision that was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The "arbitrary and capricious" standard is "highly deferential," *see Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and the court may not "substitute its judgment for that of the agency," *Keeton Corrs., Inc. v. United States*, 59 Fed. Cl. 753, 755 (2004) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated in part by Califano v. Sanders*, 430 U.S. 99, 105 (1977)), *recons. denied*, 60 Fed. Cl. 251 (2004).

Notwithstanding this deferential standard, the court may set aside a procurement action if "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (citations omitted). The "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency's decision lacks a rational basis, and is therefore arbitrary and capricious, when the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or [the decision] is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Alabama Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *State Farm*, 463 U.S. at 43).

## ANALYSIS

### A. Cost-Price Analysis

CSC advances three primary arguments regarding USSTRATCOM's evaluation of the cost-price factor: (1) that the government failed to properly conduct a cost-realism analysis for CLIN X101 of HPES's and [***]'s proposals, (2) that the government did not perform the compensation analysis required by FAR § 52.222-46, and (3) that the cost-price evaluation was inconsistent with the technical evaluation of CSC's proposal regarding CLIN X101. *See* Mem. In Support of Pl.'s Mot. for Judgment on the Administrative Record ("Pl.'s Mot.") at 8-25, ECF No. 44-1.

*1. Cost-realism analysis of CLIN X101.*

CSC argues that USSTRATCOM made two material errors in the cost-realism analysis of its competitors' proposals for CLIN X101. First, CSC asserts that the government failed to assess the option year costs for CLIN X101 in the other offerors' proposals, instead focusing only on the base year numbers. Pl.'s Mot. at 8. Second, CSC argues that USSTRATCOM did not "evaluate the cost realism of the offerors' direct labor rates." *Id.*

In applying the arbitrary and capricious standard, the court has held that "cost[-]realism determinations are within an agency's 'sound discretion and expertise,' [and] the [c]ourt will not overturn a cost[-]realism determination unless the plaintiff demonstrates the absence of a rational basis for the agency's decision." *A-T Solutions, Inc. v. United States*, 122 Fed. Cl. 170, 180 (2015) (quoting *CTA Inc. v. United States*, 44 Fed. Cl. 684, 693 (1999)). The cost-realism analysis "need not have been performed with 'impeccable rigor,'" but it "must reflect that the agency considered the information available and did not make 'irrational assumptions or critical miscalculations.'" *Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 286 (2007) (quoting *OMV Med., Inc. v. United States*, 219 F.3d 1337, 1344 (Fed. Cir. 2000)). In a best value procurement such as this one, the contracting officer inherently exercises significant discretion. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004).

Regarding the assessment of option year costs, CSC argues that the government did not account for HPES's reduced option year staffing when it closed the pertinent EN and accepted the company's proposal for CLIN X101 as realistic. *See* Pl.'s Mot. at 8-10. In response to the evaluator's assessment that HPES's initial cost proposals were too low, HPES adjusted its staffing approach to [***]% of historical hours, providing for [***] FTEs during the base period and reducing staffing levels in the option years to [***] FTEs in option years 1 through 3 and to [***] FTEs for the rest of the contract. AR 19b-39248 to -49. USSTRATCOM accepted this proposal, stating:

> The contractor increased the baseline engineering tasks to [***]% of historical hours and states the remaining hours are covered through expansion tasking. The [***]% is based on work done at other COCOM[, *i.e.*, Combat Commands,] similar to STRATCOM size. The contractor also assigns staff with specific skillsets to the appropriate WBS[, *i.e.*, Work Breakdown Structure,] elements. There are no entry level Engineers and a good mix of skill levels.

AR 19b-39249. CSC argues that this EN assessment indicates that USSTRATCOM evaluators only considered the base period staffing and failed to evaluate the cost realism of the staff reductions in the option period. Pl.'s Mot. at 10. Furthermore, CSC asserts that if the government had properly performed the cost-realism analysis, it would have adjusted the option year periods to reflect [***]% of historical hours, which would result in a probable cost adjustment of $[***] (placing it at a higher cost than CSC's proposal). *Id.* at 11 & Attach. Aff.

of Stephen J. Kiraly ¶ 16(d) ("Kiraly Aff."), ECF No. 44-2.[9]  CSC makes similar arguments regarding USSTRATCOM's evaluation of [***]'s staffing and cost for CLIN X101 in the option years.[10]

Contrary to CSC's assertions, the record indicates that USSTRATCOM considered all option years of HPES's proposal in its cost-realism analysis.  The final Proposal Analysis Report states that the price analysis of all CLINs included the base period and all option years.  AR 29-42663.  This is supported by USSTRATCOM's calculations of engineering staffing levels in its final cost evaluation of HPES's proposal.  *See* AR Tabs 23 and 44.  Furthermore, the proposed cost of CLIN X101 "was determined realistic and reasonable in accordance with the stated methodology in M.3.3.2 [of the RFP]."  AR 29-42663.  These recitations and data adequately indicate that USSTRATCOM considered the option periods in CLIN X101 in its cost-realism analysis of HPES's proposal, and thus had a rational basis for its realism findings.[11]  The alternative calculations presented by CSC do not show that USSTRATCOM's findings were irrational; rather, they reflect disagreement with the evaluators' assessment of the "unique methods of performance" in the offerors' proposals.  *See* FAR § 15.404-1(d)(1).

Secondly, CSC argues that USSTRATCOM failed to evaluate the realism of the offerors' proposed direct labor rates.  CSC asserts that the government only compared the rates proposed with rates on file with the Defense Contract Audit Agency ("DCAA"), and that neither the government nor DCAA analyzed whether the proposed rates were actually realistic.  Pl.'s Mot. at 12.  USSTRATCOM requested field pricing assistance from DCAA for its assessment of direct labor rates, and DCAA's results "w[ere] relied upon as the primary form of cost analysis for CLIN X101."  AR 29-42653.  DCAA could not verify HPES's proposed rates because they were

---

[9]Pending before the court is the government's motion to strike the Kiraly Affidavit, ECF No. 49.  The affidavit was filed as an exhibit to CSC's motion for judgment on the administrative record and evaluates USSTRATCOM's cost-price assessment of HPES's proposal.  *See generally* Kiraly Aff.  The motion is granted in part and denied in part.  The court will consider Mr. Kiraly's affidavit as part of the record in this case related to prejudice but not as an addition or supplement to the administrative record.

[10]CSC contends that "[t]he record is likewise devoid of any evidence that [USSTRATCOM] conducted any meaningful analysis of the realism of [***]'s staffing and associated cost for CLIN X101 in the option years."  Pl.'s Mot. at 10.  Mr. Kiraly calculated that if USSTRATCOM had adjusted [***]'s proposed costs in the option years to reflect the same staffing levels proposed in the base period, it would have applied a probable cost upward adjustment of $[***].  Kiraly Aff. ¶ 23.

[11]The record also reflects that USSTRATCOM considered all years of [***]'s proposal in its cost-realism analysis.  *See* AR 89b-51342 (explaining that [***]'s proposed CLIN X101 staffing approach was realistic because, among other things, it included an "average of [***] FTE - [***] FTE" over the contract period); AR 29-42801 to -02 ("The TEP is inclusive of all CLINs for the base period (including the phase-in period), all option periods, and the 6-month extension period . . . [and] CLIN X101 was determined realistic and reasonable in accordance with the stated methodology in M.3.3.2.").

based on the Economic Research Institute's Salary Assessor Tool rather than the Forward Pricing Rate Proposal rates on file with DCAA.  *See* AR 23-41253, -56.[12]  CSC asserts that the government did not perform any further cost-realism analysis of HPES's direct labor rates, and that this failure led it to overlook that HPES's rates were "consistently and significantly lower" than the rates paid by CSC as the incumbent contractor.  Pl.'s Mot. at 13-14.  Because HPES "plan[ned] to rely extensively on incumbent personnel to perform the ITCC II [c]ontract," CSC argues that HPES's proposed labor rates were unrealistic to actually retain incumbent personnel.  *Id.* at 14.  According to Mr. Kiraly, had USSTRATCOM properly subjected HPES's direct labor rates to a cost-realism analysis, it would have made a proposed cost adjustment to CLIN X101 of [***].  Kiraly Aff. ¶ 30.[13]

CSC incorrectly assumes that USSTRATCOM did not perform any cost-realism analysis of the offerors' direct labor rates.  In fact, the record shows that USSTRATCOM performed an independent cost-realism evaluation.  Unless a specific methodology for conducting this analysis has been specified, agencies have broad discretion to determine the realism of a cost proposal.  *See Crowley Tech. Mgmt., Inc. v. United States*, 123 Fed. Cl. 253, 260 (2015) (citing *Afghan Am. Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 357-58 (2009) and *Northeast Military Sales, Inc. v. United States*, 100 Fed. Cl. 103, 118 (2011)).  As the government points out in its motion, the DCAA analysis was merely the evaluation of the proposed direct rates during the assessment of the initial proposals.  Def.'s Cross-Mot. at 19.  After introducing the DCAA analysis, the Proposal Analysis Report explained that the government conducted a check against the Economic Research Institute's rates, leading to the conclusion that HPES's "proposed direct labor rates appear[ed] to accurately reflect its expected actual direct labor costs."  AR 29-42654.  Furthermore, the Proposal Analysis Report indicates that USSTRATCOM conducted a cost-realism analysis of HPES's Final Proposal Revision before issuing its final decision.  The USSTRATCOM evaluators again conducted a comparative analysis, in this instance between HPES's final proposed direct rates and the rates on file with DCAA.  AR 29-42655.  Although the rates were slightly different, the government determined that both rates were "based on a realistic and acceptable methodology" and that HPES's rates were reasonable for performing the work under CLIN X101.  AR 29-42655 to -56.  CSC has not demonstrated that this analysis was insufficient to satisfy the cost-realism requirements of the RFP.[14]

---

[12]CSC also asserts that the government's analysis of [***]'s direct labor rates was limited to the DCAA rate check.  Pl.'s Mot. at 13.  DCAA compared four similar job categories from its data to [***]'s proposed direct labor rates, and the discrepancy between the selected rates ranged from [***]% to [***]%.  AR 29-42791.  DCAA considered that the discrepancy between the rates was explicable because the organization does not maintain "reliable and verifiable information" for these types of labor rates and relied on a different salary survey to address the comparison.  AR 29-42794.  [***] did not base its labor rates solely on either the DCAA information or the alternative salary survey used in the DCAA analysis.  *Id*.

[13]Mr. Kiraly did not perform a similar analysis for [***]'s proposed direct labor rates.

[14]CSC also has not demonstrated that USSTRATCOM's analysis of [***]'s direct labor rates was insufficient to satisfy the cost-realism requirements of the RFP.  The Proposal Analysis Report indicates that USSTRATCOM independently evaluated DCAA's rate check analysis.  *See*

In sum, CSC has failed to show that USSTRATCOM's cost-realism analysis of CLIN X101 lacked a rational basis.

*2. Analysis under FAR § 52.222-46.*

Next, CSC claims that USSTRATCOM failed to evaluate the offerors' compensation plans under FAR § 52.222-46, which was incorporated into the RFP by reference. *See* AR 5a-970. This provision addresses offerors' proposals that may reduce compensation (both salary and fringe benefits) for incumbent employees. FAR § 52.222-46(a). It requires offerors to "submit a total compensation plan setting forth salaries and fringe benefits proposed for the professional employees who will work under the contract." *Id.* The government then must assess the plan "in terms of its impact upon recruiting and retention, its realism, and its consistency with a total plan for compensation." *Id.* Proposed compensation rates that are lower than incumbent rates are "evaluated on the basis of maintaining program continuity, uninterrupted high-quality work, and availability of required competent professional service employees." FAR § 52.222-46(b).

CSC contends that USSTRATCOM needed to follow a two-step analysis in assessing the offerors' compensation plans under FAR § 52.222-46: first, determining "whether each offeror's compensation package [is] generally consistent with the salaries being paid by the incumbent contractor," and second, determining "whether each offeror's staffing plan is realistic, *i.e.* whether it indicate[s] that the offeror under[stands] the scope of the work." Pl.'s Mot. at 19-20 (citing *OMV Med.*, 219 F.3d at 1343, and *CRAssociates, Inc. v. United States*, 95 Fed. Cl. 357, 371 (2010)). CSC argues that USSTRATCOM did not perform the first step of this analysis, claiming that it "did not compare any offeror's proposed compensation structure for the ITCC II [c]ontract with the compensation paid under the incumbent contract." Pl.'s Mot. at 20. Without this analysis, according to CSC, USSTRATCOM failed to account for the fact that "[i]n ten of eleven CLIN X101 labor categories, HPES proposed salaries that are anywhere from[***]% to [***]% . . . lower than incumbent salaries." *Id.* at 21 (citing Kiraly Aff. ¶¶ 48-49). CSC thus argues that the government "was in no position to determine whether HPES or [***] had the ability 'to provide uninterrupted, high quality work,' to recruit and retain professional employees, and to 'encourage continuity of work force,'" or whether their "proposed compensation was realistic." *Id.* at 24 (citing AR 29-42614 to -15, -750).

As an initial matter, CSC's reliance on *OMV* is overstated. That decision does not lay out a mandatory two-prong framework for all analyses to be conducted under FAR § 52.222-46.

---

AR 29-42794 ("The Cost Team reviewed each of the prime labor categories proposed by [***] under CPIF CLIN X101, and did a comparative analysis between the [***] direct labor rates and the DCAA Rate Check rates."). USSTRATCOM determined that the discrepancy between the rates could be understood by the difference in rate methodologies, *see supra* n. 12, and therefore "t[ook] no exception to the [d]irect [l]abor [r]ates as proposed" and determined that the rates were "realistic and reasonable." AR 29-42791, -93. Similar to the analysis of HPES's proposal, these steps demonstrate that USSTRATCOM sufficiently considered the available information to arrive at a rational cost-realism decision for [***]'s proposed direct labor rates. CSC's assertion that no such analysis was performed is contrary to the record.

Rather, the two-step analytical method addressed in *OMV* was advanced by the Air Force in the RFP for the procurement at issue in that case. *See OMV Med.*, 219 F.3d at 1343 ("As provided in the RFPs, there were two components to the Air Force's review of the offerors' compensation packages . . . ."). The RFP here contained no such instruction. Therefore, USSTRATCOM was obliged to follow the requirements of FAR § 52.222-46 itself, not also additional criteria set out in the RFP. According to the Federal Circuit in *OMV*, FAR § 52.222-46 does "not require the preparation of minimum acceptable salary levels" and "nothing prohibit[s] the [government] from awarding the contract to an offeror with salary levels lower than the minimum salary levels" derived from incumbent rates. *Id.* at 1344. *OMV* thus does not superimpose a requirement on FAR § 52.222-46 to compare incumbent salary rates with proposed rates. Rather, based on the text of the regulation, the procuring agency must conduct a rational analysis of the realism of the offerors' proposed salaries with regard to program continuity, retention, and "uninterrupted high-quality work." *Id.* at 1339.[15]

USSTRATCOM satisfied the requirements of FAR § 52.222-46, as reflected in the administrative record. In its final cost-price analysis of HPES's proposal, USSTRATCOM explained that the proposal satisfies FAR § 52.222-46 wholly apart from the overall cost-price evaluation. The Proposal Analysis Report states:

> HP's Compensation Plan for Professional Employees was assessed in accordance with FAR [§] 52.222-46 and found realistic, as the Plan reflects a sound management approach and the ability to provide uninterrupted, high[-]quality work. No negative impact to recruiting and retention of professional employees is expected, as HP offers its employees a variety of benefits that encourage continuity of work force. These benefits include a total rewards philosophy, including base pay, variable pay (pay for results), rewards and recognition, a retirement plan, health and insurance benefits, and paid time off.

AR 29-42614 to -15. CSC asserts that this analysis does not account for the fact that HPES's salary rates are lower than CSC's incumbent rates. However, USSTRATCOM indicates that HPES's extensive offering of fringe benefits satisfies the requirements of FAR § 52.222-46 for recruiting, retention, and continuity of high-quality work. Unlike in *CRAssociates*, where the administrative record showed "no indication whatsoever that anyone at the [agency] focused upon the requirements of this professional services clause during the evaluation process," 90

---

[15]CSC also cites the court's decision in *CRAssociates* to support its argument that FAR § 52.222-46 requires a comparison between incumbent salaries and the offerors' proposed salary rates. *See CRAssociates*, 95 Fed. Cl. at 370-71 (applying *OMV*'s two-step test to a procurement that did not mandate those particular criteria in the RFP). In the context of this case, the court does not find the reasoning in *CRAssociates* persuasive and thus does not apply it here. Unless the RFP directs the procuring agency to perform its analysis according to a particular process or formula, a rational evaluator only needs to follow the general guides regarding compensation rate evaluations as set forth in FAR § 52.222-46. Additionally, as the government notes in its brief, the imposition of additional evaluation criteria outside the text of the FAR "would place an unfair burden on agencies, who would then be required to perform FAR analyses with an eye to every decision of the court." Def.'s Cross-Mot. at 29 n. 11; *see also* Hr'g Tr. at 56:19-25.

Fed. Cl. at 372, USSTRATCOM noted specific examples from HPES's proposal and tied them to the requirements of FAR § 52.222-46.  This explanation thus provides a sufficient basis to conclude that USSTRATCOM's analysis of HPES's compensation proposal under FAR § 52.222-46 was rational and within the bounds of the government's discretion.[16]

### 3. Consistency between USSTRATCOM's cost-price analysis and its evaluation of technical approach/technical risk.

CSC argues that USSTRATCOM's cost-price analysis of its proposal was inconsistent with the "Acceptable" rating given to its technical proposal, thus rendering the cost-price determination irrational.  The Management Approach sub-factor of the technical proposal required an evaluation of staffing, specifically requiring offerors to "ensure adequate staffing" during the phase-in process and the transition to the C2F building, and to "provide a staffing approach to adequately manage the ITCC II contract with properly qualified, security cleared, and certified personnel."  AR 5a-958.  After modifying and fleshing out its proposal in response to ENs, CSC's Final Proposal Revision regarding this sub-factor was deemed Acceptable and Low Risk.  *See* AR 29-42291 to -98.  CSC argues that this determination is inconsistent with CSC's discussions with the government regarding the cost-price factor, during which the government considered that CSC had proposed "unrealistically low" staffing levels for CLIN X101 that "could result in an MPC adjustment" if CSC failed to increase them.  Pl.'s Mot. at 16.

The RFP stated that costs would be assessed under CLIN X101 according to the following factors: whether they "(1) are realistic for the work to be performed, (2) reflect a clear understanding of the requirements; and (3) are consistent with the various elements of the offeror's technical proposal."  AR 5a-978.  CSC asserts that the government ignored the third prong of this analysis by performing separate technical and cost-price evaluations and finding that the staffing approach was Acceptable for the technical evaluation factor but not realistic on a cost-price basis, thus leading to an "arbitrary and unreasonable" decision that prevented the contract from being awarded to CSC.  Pl.'s Mot. at 15-18.

---

[16]Similarly, USSTRATCOM's evaluation of [***]'s compensation proposal satisfied the requirements of FAR § 52.222-46.  In its assessment of [***]'s proposal in the Proposal Analysis Report, USSTRATCOM explained:

> [***] Compensation Plan for Professional Employees was assessed in accordance with FAR [§] 52.222-46 and found realistic, as the Plan reflects a sound management approach and the ability to provide uninterrupted, high quality work.  No negative impact to recruiting and retention of professional employees is expected, as [***] offers its employees a competitive salary structure, a "promote-from-within" policy, and a variety of benefits that encourage continuity of work force.  These benefits include a retirement plan, medical and dental coverage, life insurance, compensatory time off, and paid time off.

AR 29-42750.  By focusing on specific details of [***]'s proposal, including salary and fringe benefits, to support its conclusion that the plan is realistic, USSTRATCOM's analysis is rational and sufficient to satisfy the requirements of FAR § 52.222-46.

CSC's argument ignores the fact that its cost-price proposal was deemed realistic in USSTRATCOM's final analysis, and USSTRATCOM did not impose a probable cost adjustment at that final stage. *See* AR 29-42404 ("The [g]overnment found each of the cost elements to be realistic and reasonable based upon the above explanation, and no Probable Cost Adjustment is required. CLIN X101's pricing is hereby determined 'realistic and reasonable.'"). After the evaluators had assessed CSC's proposed staffing levels to be "unrealistically low" during the discussion phase, *see, e.g.*, AR 10b-16116 to -17; AR 10c-21325, CSC voluntarily adjusted its staffing levels in its Final Proposal Revision to improve the realism assessment. *See* AR 12c-32411 ("CSC agrees with the [g]overnment's assessment and most probable cost adjustment for engineering and adjusted Volume III-Cost/Price accordingly.").[17] Ultimately, the evaluations of CSC's technical approach and cost-price plan were consistent because both received the most positive rating possible in the final assessment.

Furthermore, regardless of the final assessment of the technical and cost-price factors, the analysis of these factors during discussions was not inconsistent. The criteria for assessing staffing levels was different under the technical and cost-price evaluation factors. The Management Approach sub-factor of the technical assessment was evaluated based on processes, structure, and management of staff, and offerors were explicitly told that their technical proposals "shall not include cost/price information." AR 5a-957 to -58. Contrastingly, the cost-price analysis assessed the realism of the proposed costs and whether those costs accurately reflected the approach proposed under the technical sub-factor. AR 5a-978. The factors thus were related, but not the same. In short, although "the two ratings arguably should have a close correlation," they need not be identical to be rational. *See Innovative Test Asset Solutions LLC v. United States*, 125 Fed. Cl. 201, 220 n. 20 (2016). USSTRATCOM's technical evaluators could logically find that CSC's staffing approach was adequate, but the agency's cost evaluators could also conclude that CSC's proposed cost proffered before the Final Proposal Revision was not realistic to support that adequate staffing approach.

In sum, any differences between USSTRATCOM's evaluation of the technical and cost-price factors of CSC's proposal during the final phases of the discussions were explicable, rational, and within the government's discretion, and the government's final assessment ultimately contained no such inconsistencies.

### B. Technical Evaluation of Phase-In Staffing

Similar to its arguments regarding cost realism, CSC further contends that USSTRATCOM did not have a rational basis for its findings related to the phase-in section of the Management Approach sub-factor of the technical evaluation because it "failed to consider whether offerors would be able to attract incumbent personnel given each offeror's compensation plan." Pl.'s Mot. at 36. CSC reasserts that HPES's proposed salaries were lower than the incumbent rates, which created the "potential risk that HPES would not be able to hire most or

---

[17]CSC asserts that toward the conclusion of the discussion phase, USSTRATCOM coerced the company to make such an adjustment. The court is unpersuaded. *See infra*, at 25-27.

all of the incumbents it proposed to retain." *Id.* at 37. CSC asserts that HPES sought to retain [***]% of incumbent personnel, an allegedly unrealistic figure when considering the proposed salary differentials. *See* Am. Compl. ¶ 126; Pl.'s Mot at 38. CSC argues that USSTRATCOM gave only cursory consideration to the salary and retention issue and baldly accepted HPES's proposals. Pl.'s Mot. at 36-41. CSC contends that a proper analysis would have yielded an "Unacceptable" technical rating for the Management Approach sub-factor, which would have disqualified HPES from consideration for the ITCC II contract. *Id.* at 41.[18]

As in its cost-realism analysis, CSC has failed to show that USSTRATCOM's assessment of phase-in staffing lacks a rational basis. In a bid protest, "[t]he deference afforded to an agency's decision must be even greater when a trial court is asked to review a technical evaluation" because of the highly specialized, detailed, and discretionary analyses frequently conducted by the government in that regard. *L-3 Commc'ns EOTech, Inc. v. United States*, 83 Fed. Cl. 643, 650 (2008) (citing *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996)), *appeal dismissed*, 356 Fed. Appx. 390 (Fed. Cir. 2009).

For the ITCC II contract, a proposal that met "the minimum requirements of the solicitation" under the technical evaluation sub-factor would receive an "Acceptable" rating for that sub-factor. AR 5a-972. The phase-in plan, an element of the Management Approach sub-factor, had three requirements: (1) "[i]mplement a phase-in process that is reasonable and realistic for assumption of full responsibility with no interruption or degradation of service for ITCC II requirements," (2) "[i]dentify phase-in risks and measures to mitigate them," and (3) "[e]nsure adequate staffing with the appropriate security clearances, skillsets, and certifications to ensure a successful phase-in." AR 5a-958. CSC takes issue with USSTRATCOM's evaluation of the third requirement, claiming that the proposed incumbent staffing levels are not "adequate" because the government failed to account for differences in salary levels.

First, CSC's statement that HPES sought to retain [***]% of incumbent personnel is incorrect. HPES sought to staff [***]% of the ITCC II contact with incumbent personnel. AR 21a-40528. Under HPES's phase-in-plan, however, its proposal reduced the number of FTE employees from 309 under the ITCC I contract to [***]. *See* AR 48-45723. To staff [***]% of the contract with incumbent employees, HPES would have to retain [***] incumbent FTEs, which equals only [***]% of the ITCC I personnel. Def.'s Cross-Mot. at 21.

Further, USSTRATCOM properly assessed HPES's proposal for phase-in staffing in light of the RFP requirements and its relatively low retention goals, and provided sufficient reasoning to show that its assessments were rationally based. In the Proposal Analysis Report, USSTRATCOM cites to HPES's proposal for phase-in staffing to determine that the "plan is well thought out and shows some experience phasing into contract support" and "clearly meets

---

[18]CSC similarly avers that USSTRATCOM failed to assess [***]'s proposed retention of incumbent personnel in light of [***]'s proposed reduced salaries. *See* Pl.'s Mot. at 41 (arguing that USSTRATCOM "credited [***] for proposing to staff [***]% of the ITCC II contract with incumbent personnel – calling it a 'reasonable goal' – even though the [government] never evaluated whether [***]'s proposed [p]hase-[i]n plan was feasible given its proposed compensation").

the minimum requirements" of the solicitation.  AR 29-42559.  In that proposal, HPES detailed how it would retain incumbent personnel and attract new employees, including the use of dedicated recruitment websites, targeted job fairs, succession planning, and competitive and comprehensive benefits plans.  AR 21a-40583 to -88.  HPES also emphasized its significant experience in completing phase-in projects and recruiting and retaining highly qualified personnel.  *See, e.g.*, AR 21a-40580 ("We have successfully completed more than 1,000 transitions using our Transition and Transformation Methodology (TTM), including hiring incumbent staff and changing the contract approach.").  USSTRATCOM relied upon this specific, detailed plan and experience to support its "Acceptable" rating of HPES's phase-in plan.  That reliance is rational in light of the record.[19]

### C. Past Performance Evaluation

CSC next asserts that USSTRATCOM's "Substantial Confidence" assessment of HPES's past performance was arbitrary and capricious.  CSC claims that the government should have sought out and evaluated HPES's performance on the 2014 NASA ACES contract, an IT contract with parameters to similar to those of the ITCC II contract.  *See* Pl.'s Mot. at 42.  This evaluation allegedly would have shown that HPES had "significant problems implementing the ACES contract," leading to continued difficulty throughout contract performance.  *Id.* (citing Paul K. Martin, National Aeronautics and Space Administration, *Review of NASA's Agency Consolidated End-User Services Contract (IG-14-013)* (Jan. 30, 2014), https://oig.nasa.gov/audits/reports/FY14/IG-14-013.pdf.).

"In reviewing an agency's rating of past performance, this court should focus on whether 'the evaluation was reasonable, consistent with the stated evaluation criteria[,] and compli[ant] with the relevant statutory and regulatory requirements.'"  *RISC Mgmt. Joint Venture v. United States*, 69 Fed. Cl. 624, 634 (2006) (quoting *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 659 (2002), *aff'd*, 56 Fed. Appx. 474 (Fed. Cir. 2003)).  Agencies are given "broad discretion" in evaluating past performance information, including the extent to which a prior contract is considered "relevant."  *Glenn Defense Marine (ASIA), PTE Ltd. v. United States*, 720 F.3d 901, 910-11 (Fed. Cir. 2013) (citing *PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 539 (2010) ("At the outset, it is important to note that what does or does not constitute 'relevant' past performance falls within the [Source Selection Authority's] considered discretion.")).

---

[19]Similarly, USSTRATCOM's "Acceptable" rating for [***]'s phase-in plan is rationally based on [***]'s detailed proposal.  The government determined that "[t]he [t]echnical [a]pproach rating [for the phase-in plan] of [A]cceptable is supported based on detailed information in the contractor's proposal that addressed each criteri[on] of the RFP; [p]hase-in, staffing, security clearances, certifications, skillsets, and [p]rogram [m]anagement."  AR 29-42689.  [***] sought to staff the ITCC II contract with [***]% incumbent personnel.  *Id.*  In [***]'s proposal, it explained how it would retain incumbent employees, such as through a "talent engagement website," in-person recruitment events, and career development programs, as well as how it would attract new employees to fill the remainder of the positions.  *See* AR 92a-57275 to -83.  This specific proposal provides a rational basis for USSTRATCOM's determination that [***] met the minimum requirements of the RFP for the phase-in plan.

It was within USSTRATCOM's discretion to evaluate only the references provided by HPES. According to the RFP, offerors were to submit at least three but no more than six references of contracts they had performed since June 1, 2011. AR 5a-974. USSTRATCOM reserved the right to seek out and assess other information regarding the offerors' past performance, including information from various government databases, AR 5a-974, but it was not required to conduct such additional research. In HPES's case, HPES submitted six references that were deemed relevant, and USSTRATCOM located three additional contracts that were deemed not to be relevant. AR 29-42585. USSTRATCOM conducted a detailed evaluation of the six relevant references, *see* AR 29-42587 to -611, and determined that "HPES has five Very Relevant past performance record[s] with two considered Exceptional and three Very Good in Quality Performance, and one determined to be Relev[a]nt with Exceptional in performance." AR 29-42612. CSC does not dispute that this aspect of USSTRATCOM's evaluation was reasonable. *See* Def.'s Cross-Mot. at 44. According to the RFP, a Substantial Confidence rating is warranted where "a minimum of two of the offeror-provided references . . . [are] given both a Past Performance Relevancy Rating of either V[ery ]R[elevant] or R[elevant] and a Performance Rating of either E[xceptional] or V[ery Good]." AR 5a-977. HPES's past performance review markedly exceeded the minimum requirements for the past performance rating it received from USSTRATCOM.

Even so, CSC presses its contention, arguing that USSTRATCOM did not follow the RFP when it searched for relevant contracts because it restricted its search to contracts that started after June 1, 2011, rather than including all contracts that had been in the midst of performance at that time. Pl.'s Mot. at 43. According to CSC, this resulted in the government's failure to consider the "highly-relevant" ACES contract. *Id.* Contrary to CSC's assertions, USSTRATCOM was not obligated to apply any particular search criteria when researching offerors' past performance; in fact, it was not obligated to conduct this research at all. It merely had to ensure that the past contracts to be considered fit within the specifications of the RFP, *i.e.*, that they had been performed after June 1, 2011 for at least one year.

CSC urges further that USSTRATCOM's failure to analyze the ACES contract was arbitrary and capricious because "an agency may not ignore prior performance information of which it is aware." Pl.'s Mot. at 44 (quoting *BCPeabody Constr. Servs., Inc. v. United States*, 112 Fed. Cl. 502, 512 (2013), *appeal withdrawn*, 559 Fed. Appx. 1033 (Fed. Cir. 2014)). It argues that USSTRATCOM must have been aware of the ACES contract because HPES referenced it in its proposal. *Id.*; *see also* Def.'s Cross-Mot. at 46. There is no indication in the record, however, that USSTRATCOM actually was aware of HPES's poor performance evaluation under the ACES contract. HPES only referred to the contract fleetingly in its proposal, *see* AR 21a-40527, -580, -593, -678, -731, and those references cannot be said to have led the government to the ACES contract evaluation for use in its past performance assessment. CSC has thus failed to show that it was irrational for USSTRATCOM to issue a past performance evaluation for HPES in the absence of considering the ACES contract.

Finally, even if USSTRATCOM had negatively evaluated the ACES contract in its past performance assessment, it would have no effect on HPES's Substantial Confidence rating. As previously explained, CSC does not dispute that USSTRATCOM's evaluation of the contracts provided by HPES was rational. The ratings given to the six references in that evaluation

exceeded the RFP requirements of two Very Relevant/Relevant and Exceptional/Very Good references.  The addition of the ACES contract would not bear on those ratings, and the Substantial Confidence rating would therefore remain rational.

In sum, USSTRATCOM had a rational basis for giving HPES a Substantial Confidence rating for the past performance factor, and CSC has failed to show that the decision was arbitrary and capricious.

### D. USSTRATCOM's Discussions with Offerors

Finally, CSC maintains that its discussions with USSTRATCOM were misleading, unequal, and coercive.  Generally, discussions with offerors must be "meaningful," meaning that they "generally lead offerors into the areas of their proposals requiring amplification or correction, which means that discussions should be as specific as practical considerations permit."  *Advanced Data Concepts, Inc. v. United States*, 43 Fed. Cl. 410, 422 (1999), *aff'd*, 216 F.3d 1054.  And, "[a] contracting officer has broad discretion in conducting discussions" as long as they are meaningful.  *DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 668 (2010) (internal quotation marks and citations omitted).

#### 1. USSTRATCOM's discussions were not misleading.

"Discussions are misleading when a procuring agency issues 'incorrect, confusing or ambiguous' communications that misdirect an offeror attempting to revise its proposal."  *CEdge Software Consultants, LLC v. United States*, 117 Fed. Cl. 419, 434-35 (2014) (citing *DMS All-Star Joint Venture*, 90 Fed. Cl. at 670); *see also D&S Consultants, Inc. v. United States*, 101 Fed. Cl. 23, 40-41 (2011) ("[A]n agency is not permitted to mislead an offeror 'into responding in a manner that does not address the agency's concerns; or that misinforms the offeror concerning its proposal weaknesses or deficiencies.'") (quoting *Analytical & Res. Tech., Inc. v. United States*, 39 Fed. Cl. 34, 48 (1997)), *aff'd*, 484 Fed. Appx. 558 (Fed. Cir. 2012).  Here, CSC contends that USSTRATCOM "affirmatively misled" it into raising its CLIN X101 costs "to a degree far greater than was necessary to be considered realistic and eligible for the ITCC II [c]ontract award."  Pl.'s Mot. at 26.  Specifically, CSC argues that USSTRATCOM did not have a rational basis for rejecting the efficiencies it proposed to justify the reduction of engineering hours from its proposed [***]-hour baseline to [***] hours.  *Id.*  CSC further argues that USSTRATCOM made a "greater than necessary MPC adjustment to [CSC's] proposed CLIN X101 engineering costs" that caused CSC to excessively raise its costs in the Final Proposal Revision.  *Id.*

CSC proposed the [***] hour historical baseline for CLIN X101, and proposed various efficiencies that would reduce actual hours to [***].  AR 10a-10233; 10b-16117 to -18.  By the final round of discussions, CSC had proposed five categories of efficiencies: [***].  AR 10c-21326.  USSTRATCOM considered these proposed efficiencies in its response.  It first accepted that [***] and [***] would contribute to reducing CLIN X101 hours.  AR 10c-21329 to -30.  In rejecting the other proposed efficiencies, USSTRATCOM explained that CSC had not "demonstrate[d] any unique and innovative approaches, [had not] provide[d] an adequate explanation regarding the unrealistically low staffing, and fail[ed] to explain how the reasons provided w[ould] result in a manning level of [***] hours."  AR 10c-21325; *see also* AR 10c-

21329 to -30.  This explanation sets out a rational basis for rejecting CSC's proposed efficiencies because CSC had not justified how those efficiencies would realistically reduce engineering hours for CLIN X101.  CSC could not have been misled by these specific grounds for rejecting a portion of its proposal.

CSC also claims that USSTRATCOM's reliance on [***] hours as the baseline estimate for CLIN X101 engineering hours prevented the government from considering any of its proposed efficiencies.  Pl.'s Mot. at 27.  This argument lacks merit.  First, as explained *supra*, it is evident that USSTRATCOM did consider all of CSC's efficiencies, accepting a few and finding most to be unrealistic for reducing engineering hours to [***].  Further, CSC proposed the [***]-hour estimate, not the government.  The government performed its own calculations and determined that required staffing levels for CLIN X101 would be approximately 76,800 hours, *see* AR 65b-46113 (Engineering tab, cell M39), but in the context of CSC's proposal it accepted the [***]-hour figure, AR 10a-10233.  USSTRATCOM's problem with CSC's proposed reduction in hours was not with the [***]-hour estimate, but rather was with CSC's failure to adequately justify the further reduction in hours from [***] to [***] via efficiencies.  The agency's approach during discussions was rational and supported by the record, and therefore was not misleading.

USSTRATCOM's proposed MPC adjustment to CSC's proposal was also not misleading.  In the pre-Final Proposal Revision stage, USSTRATCOM imposed an MPC adjustment to CSC's CLIN X101 proposal, resulting in an MPC of $[***].  AR 28-42117.  CSC claims that this MPC adjustment was misleading because it resulted in an MPC for CSC that was $[***] million greater than the MPC for HPES, "despite finding that HPES's Technical proposal was not materially different from [CSC's] proposal."  Pl.'s Mot. at 29.  As a result, CSC asserts that it would not have raised its proposed costs in its Final Proposal Revision but for this allegedly misleading MPC adjustment.  *Id.*  However, as previously explained, USSTRATCOM had a rational basis for rejecting CSC's proposed efficiencies, and issued the MPC adjustment when CSC failed to explain fully how it would reduce CLIN X101 engineering hours in light of those rejections.  CSC does not contend that HPES had similar cost-related disputes with the government in the pre-FPR stage, and the government was under no obligation to explain the posture of other offerors or differences between their proposals and CSC's offering.  *See WorldTravelService v. United States*, 49 Fed. Cl. 431, 439 (2001) ("[A]gencies need not discuss every aspect of the proposal that receives less than the maximum score or identify relative weaknesses in a proposal that is technically acceptable but presents a less desirable approach than others.") (citations omitted).  Furthermore, CSC explicitly accepted the MPC adjustment in its Final Proposal Revision and provides no further evidence to show that the adjustment was incorrect or improper.  *See* AR 12c-32411 ("CSC agrees with the [g]overnment's assessment and most probable cost adjustment for engineering and adjusted Volume III-Cost/Price accordingly.").  The MPC was rationally based, and CSC accepted it as such in exercising its own business judgment by putting forward its Final Proposal Revision, so it cannot now claim to have been misled because it failed to win the contract.  *See Academy Facilities Mgmt. v. United States*, 87 Fed. Cl. 441, 458 (2009) (finding that pricing differences between offerors arising from discussions with the government were the result of the offerors' business decisions).

*2. USSTRATCOM's discussions were not unequal.*

CSC further asserts that the discussions were unequal and therefore unfair. The government is required to conduct discussions with "integrity, fairness, and openness." FAR § 1.102(b)(3). This duty of fairness in discussions bars the government from engaging in "impermissible and prejudicial conduct favoring one offeror over another." *DMS All-Star Joint Venture*, 90 Fed. Cl. at 672. However, although preferential treatment is impermissible, the government is "not required to conduct identical discussions with each offeror." *Id.* (citing *Femme Comp. Inc. v. United States*, 83 Fed. Cl. 704, 735 (2008)). Rather, discussions should be tailored to each offeror's proposal "with the scope and extent of discussions resting squarely within the judgment of the contracting officer." *Id.* (citing *WorldTravelService*, 49 Fed. Cl. at 440; FAR § 15.306(d)(3)).

CSC contends that USSTRATCOM unfairly held it to a higher standard than HPES in discussions, "painstaking[ly] review[ing]" CSC's proposals for CLIN X101 while allowing HPES to escape scrutiny. Pl.'s Mot. at 30-31. CSC alleges that HPES and CSC proposed similar efficiencies to reduce engineering hours for CLIN X101, but USSTRATCOM only approved the efficiencies in HPES's proposal. *Id.* at 31-33. What CSC fails to acknowledge, however, is that both CSC's and HPES's initial hourly estimates were rejected by USSTRATCOM in the first round of discussions as unrealistically low. *See* AR 10a-10235; 19a-38351. Whereas CSC stuck to its [***] hour figure throughout discussions without explaining to USSTRATCOM's satisfaction how that number was realistic for CLIN X101, HPES adjusted its base year estimates upward to [***]% of historical hours and slowly decreased those hours over the life of the contract (while keeping staffing levels significantly above [***] hours for all years). *Compare* AR 10b-16117 to -19 *and* AR 10c-21329 to -30 (CLIN X101 staffing discussions with CSC), *with* AR 19b-39248 to -49 (CLIN X101 staffing discussions with HPES). USSTRATCOM only accepted HPES's proposed efficiencies and its CLIN X101 proposal as realistic when HPES made that significant adjustment to its estimates. AR 19b-39249. It was not unequal for USSTRATCOM to accept HPES's proposal and reject CSC's when CSC failed to account for the significant difference in engineering hours between the two proposals through proposed efficiencies. USSTRATCOM's treatment of HPES and CSC in discussions was rational in light of the differences between these offerors' proposals, so the court therefore rejects CSC's contention that discussions were unfair and unequal.

*3. USSTRATCOM's discussions were not coercive.*

Finally, CSC asserts that USSTRATCOM's discussions coerced it into raising its proposed costs for CLIN X101 to levels that caused it to lose the ITCC II contract. As CSC puts it, USSTRATCOM "threatened" CSC in its FPR request with a potential adverse responsibility determination for failing to raise its CLIN X101 costs to realistic levels. Pl.'s Mot. at 33-34. In pertinent respect, USSTRATCOM stated:

The significant discrepancy between [CSC's] proposed costs for CLIN X101 and the probable cost as determined [by USSTRATCOM] raises questions as to whether [CSC's] proposal meets the requirements of FAR [§] 9.104-1. Solicitation paragraph M1, Basis of Award, states that "[a]ward will be made to the offeror who is deemed responsible in accordance with FAR Part 9 . . . ," while FAR [§] 9.103(c) states that "[t]he award of a

contract to a supplier based on lowest evaluated price alone can be false economy if there is subsequent default, late deliveries, or other unsatisfactory performance resulting in additional contractual or administrative costs.  While it is important that [g]overnment purchases be made at the lowest price, this does not require an award to a supplier solely because that supplier submits the lowest offer.  A prospective contractor must affirmatively demonstrate its responsibility, including, when necessary, the responsibility of its proposed subcontractors."  **Should [CSC's] FPR require a probable cost adjustment and include a significant discrepancy between the proposed costs and the probable cost, this may preclude the Contracting Officer from making an affirmative determination of responsibility.  The absence of an affirmative determination of responsibility would render [CSC's] proposal ineligible for award.**

AR 11-32043 (emphasis in original).  CSC argues that in light of USSTRATCOM's emphatic statement, it "had no choice but to acquiesce" and raised its price to avoid an adverse responsibility determination that could have "undermined the company's competitive position for the foreseeable future."  Pl.'s Mot. at 34.

Even though USSTRATCOM's FPR request affected CSC's strategy in responding, CSC cannot reasonably argue that it was coerced.  First, the statement could have been true – USSTRATCOM might have issued an adverse responsibility determination under the FAR if CSC had not raised its prices or adequately justified its drastic reduction in engineering costs.  *See* 48 FAR §§ 9.103, 9.104.  In any event, any adjustments that CSC made in its Final Proposal Revision after receiving USSTRATCOM's notice were made within the company's business judgment.  Although CSC was "free to make any adjustment to its cost-savings proposals, or none at all, based on its assessment of the validity of the [government's] concerns," *Innovative Test Asset Solutions*, 125 Fed. Cl. at 226, it chose to acknowledge the pre-FPR MPC adjustment and the concerns raised in USSTRATCOM's notice, and raised its costs for CLIN X101 in its FPR.  *See* AR 12c-32411 ("CSC agrees with the [g]overnment's assessment and most probable cost adjustment for engineering and adjusted Volume III-Cost/Price accordingly.").  There is no evidence in the record to show that CSC was coerced into making this adjustment.  Because CSC voluntarily made this change, and did so in a way that acknowledged the government's concerns, the court cannot find that USSTRATCOM's actions were in any way improper.  *See Academy Facilities Mgmt.*, 87 Fed. Cl. at 459 (concurring with an advisory opinion by GAO that a firm's decision to adjust prices as a result of discussions with the agency "reflects the exercise of the firm's own business judgment, not improper conduct by the agency") (quoting *Academy Facilities Mgmt.*, B-401094.3, Advisory Opinion, at 6 (Comp. Gen. May 21, 2009)).

In sum, CSC has failed to demonstrate that USSTRATCOM's discussions regarding CLIN X101 were coercive or beyond the scope of its discretion.[20]

---

[20]Because this court has found that USSTRATCOM's evaluations with regard to the technical, past performance, and cost-price factors were not arbitrary and capricious, it need not independently address CSC's summarizing argument that USSTRATCOM's best-value determination was flawed by the alleged errors in the evaluation process.  *See* Pl.'s Mot. at 45.

**CONCLUSION**

For the reasons stated, CSC's motion for judgment on the administrative record is DENIED.  The government's and HPES's cross-motions for judgment on the administrative record are GRANTED.  As a result, CSC's motion for a preliminary injunction is also DENIED. The government's motion to strike the Kiraly affidavit is GRANTED IN PART and DENIED IN PART for the reasons explained *supra*, at 13-14 n. 9.[21]  The clerk is directed to issue final judgment in accord with this disposition.

No costs.

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge

---

[21]CSC's motion for leave to file an amended complaint, ECF No. 36, *see also* ECF No. 39, is GRANTED.